38 P.3d 95

Karyn NELSON, Plaintiff–Appellant,

v.

UNIVERSITY OF HAWAI‘I, as body corporation; Bart Buxton, individually and in his official capacities as Athletic Training Education Director and Assistant Professor of the Health and Physical Education and Recreation Department, University of Hawai‘i–Manoa; Kwok W. Ho, individually and in his official capacity as Chair of Health and Physical Education and Recreation Department, University of Hawai‘i, Defendants–Appellees,

and

John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; Doe Unincorporated Organizations 1–10; and Doe Governmental Agencies 1–10, Defendants.

No. 22236.

Supreme Court of Hawai‘i.

Dec. 11, 2001.

R. Steven Geshell, Honolulu, on the briefs, for plaintiff-appellant.

Elton K. Suzuki and Janice T. Kemp, Deputy Attorneys General, on the briefs, for defendants-appellees.

MOON, C.J., LEVINSON, NAKAYAMA, and ACOBA, JJ., and RAMIL, J., Dissenting.

Opinion of the Court by MOON, C.J.

Plaintiff-appellant Karyn Nelson brought an action against action against defendants-appellees the University of Hawai'i, Bart Buxton (Dr. Buxton), and Kwok W. Ho (Dr. Ho) [hereinafter, collectively, Defendants], involving numerous claims arising out of her employment as an assistant professor at the university. Following a jury trial, before then-circuit court judge, the Honorable James R. Aiona, Jr., the jury returned a verdict in favor of Nelson on her claim of negligent infliction of emotional distress (NIED), awarding her $50,000.00 in damages; the jury found in favor of Defendants on all other claims presented, including Nelson's claim of employment discrimination. Thereafter, the trial court granted Defendants' motion for judgment notwithstanding the verdict (JNOV) and entered final judgment in favor of Defendants on all claims. Nelson appeals the judgment, alleging that the court erred by: (1) excluding Nelson's

proffered rebuttal evidence; (2) improperly instructing the jury regarding the elements of a sexual harassment claim and rejecting Nelson's proposed jury instructions; (3) granting Defendants' motion for JNOV; and (4) denying Nelson's motion for a new trial or to amend the judgment to increase the damage award for her NIED claim. For the reasons set forth below, we vacate the judgment and remand for a new trial on Nelson's claims of employment discrimination as well as negligent and intentional infliction of emotional distress. In light of our disposition, we need not address Nelson's claim that the trial court erred in denying her motion for a new trial or to amend the judgment.

## I. BACKGROUND

In August 1992, Nelson was hired by the University of Hawai'i at Manoa (the University) as an assistant professor in the Department of Health, Physical Education, and Recreation (HPER) of the College of Education. Nelson alleged that she was subjected to discriminatory treatment and harassment based on her gender throughout her employment, but that problems with Dr. Ho, the chair of HPER, and Dr. Buxton, a fellow faculty member, escalated in 1994. At that time, Nelson also began experiencing seizures, allegedly as a result of stress. Although her contract was renewed for an additional year, Nelson claimed that the discriminatory treatment continued and that the University failed to provide reasonable accommodations for her disability.

After attempting to informally resolve the issues within HPER, Nelson filed a formal complaint on February 3, 1995 with the University's Equal Employment Office (EEO), alleging disability discrimination and sexual harassment. She filed a separate complaint with the University's EEO on May 16, 1995, alleging retaliation triggered by the filing of her initial complaint. Nelson's complaints were denied by the University on the basis of insufficient evidence, as were her appeals. Nelson filed a charge of discrimination with the Hawai'i Civil Rights Commission (HCRC) on July 7, 1995 and received a right to sue letter from the HCRC on October 16, 1995. She also filed a complaint with the United States Equal Employment Opportunity Commission (EEOC), and the EEOC issued a right to sue letter on October 11, 1995.

On January 4, 1996, while still employed as an assistant professor, Nelson filed a complaint in the first circuit court against the University, Dr. Buxton, and Dr. Ho, which included claims of: (1) employment discrimination, under Hawai'i Revised Statutes (HRS) § 378-2 (Supp.1994); (2) violations of her constitutional rights;[1] (3) violation of public policy; (4) negligent retention of Dr. Buxton; and (5) negligent and intentional infliction of emotional distress. Nelson sought general, special, and punitive damages, declaratory and injunctive relief, and attorney's fees.

In the spring of 1996, after she filed suit, Nelson's annual contract was not renewed, and her employment terminated at the end of May 1997. Although Nelson filed a formal grievance with the University, alleging ongoing discrimination and retaliation, she did not file a separate charge of discrimination with the EEOC or the HCRC based on the nonrenewal of her contract in 1996. Nelson did not move to amend her complaint to include the nonrenewal of her contract as a specific incident of discriminatory treatment or to include a separate claim for relief based on the nonrenewal.

On October 21, 1998, Defendants filed a motion for judgment on the pleadings and summary judgment. On November 18, 1998, then-circuit court judge, the Honorable Kevin S.C. Chang, granted Defendants' motion in part, dismissing with prejudice Nelson's claims for constitutional violations, violation of public policy, negligent retention, and injunctive relief. The circuit court denied Defendants' motion with respect to all other claims without prejudice to a motion for directed verdict at trial. Consequently, the

---

1. Nelson claimed violation of her freedom of speech under article I, section 4 of the Hawai'i Constitution, violation of the equal protection and due process clauses of the Hawai'i Constitution, and denial of her right to equality on account of sex under article I, section 3 of the Hawai'i Constitution.

following claims proceeded to trial: (1) disability discrimination, in violation of HRS § 378–2(1)(A); (2) sex discrimination/sexual harassment, in violation of HRS § 378–2(1)(A); (3) unlawful retaliation, in violation of HRS § 378–2(2); (4) invasion of privacy; (5) negligent infliction of emotional distress (NIED); and (6) intentional infliction of emotional distress (IIED).

## A. *Motion in Limine*

On November 25, 1998, Defendants filed a motion in limine to exclude "any reference by [Nelson] that the nonrenewal of her contract was due in any way to retaliation or discrimination." In their motion, Defendants argued that the nonrenewal of her contract was not an issue in this case because (1) Nelson's failure to file a charge of discrimination with the EEOC or the HCRC, based upon the nonrenewal, precluded the court from considering the nonrenewal as part of the discrimination claim and (2) Nelson had not stated a claim for wrongful termination. At the hearing on the motion, Nelson argued that the nonrenewal of her contract was the result of the ongoing sex and disability discrimination and retaliation during her tenure at the University. Nelson maintained that she suffered emotional distress as a result of the discrimination and that the Defendants failed to provide reasonable accommodations for her disability, which eventually affected her ability to perform her job. Thus, Nelson argued that the nonrenewal of her contract was relevant to the discrimination and emotional distress claims as well as the damages resulting from those claims. The trial court granted Defendants' motion, stating as follows:

> Defendant[s'] motion in limine is granted in relation to, and only in relation to, the fact that it is not a cause of action; in other words, that their non-renewal of the contract is not a cause of action in relation to sexual discrimination or retaliation.
>
> Now, that's a very fine ruling in the sense that I am not saying . . . that you're precluded from bringing up, as [the defense] has conceded, any evidence relating

to the way your client was treated throughout her tenure at the university, and that obviously is admissible, but the renewal process is precluded.[2]

## B. *Evidence at Trial*

Testimony adduced at trial, relevant to Nelson's employment discrimination and emotional distress claims, included, *inter alia,* the following:

Nelson testified that, prior to accepting the position of assistant professor, she disclosed that she: (1) suffered from epilepsy; (2) had undergone brain surgery two years earlier, after which she had been free from seizures; and (3) was able to perform her duties. Nelson claimed that, although Drs. Ho and Buxton made sexually offensive remarks, jokes, and innuendos and exhibited hostility toward women throughout the time she was employed, she stated that they did not make sexual advances toward her. For example, Nelson testified that Dr. Ho made repeated comments about how living in Hawai'i required two incomes and how she needed a man in her life. According to Nelson, Dr. Ho also suggested that she should go to Chinatown and find an old Chinese gentleman to take care of her. Since her employment in 1992, Nelson had participated in a research project on Moloka'i coordinated by Dr. Ho and claimed that Dr. Ho treated her differently from other male professors on the research team. For example, Nelson claimed that she encountered difficulties in obtaining material from Dr. Ho that was necessary for her to evaluate data for publication.

With respect to Dr. Buxton, Nelson testified that he repeatedly made offensive and degrading comments to her and about women in general. For example, Nelson claimed that, when she was arranging books and files in her new office at the University, Dr. Buxton, whose office was next to hers, remarked, "That's how we like to see women around here on their knees and begging." Ron Hetzler, another HPER faculty member at the time, testified that he recalled Dr. Buxton

---

**2.** On appeal, plaintiff has not raised as a point of error the trial court's ruling on the motion in limine.

making such a comment and that it "didn't seem appropriate." Dr. Buxton admitted telling Nelson that it was good to see her down on her knees putting her books away, but essentially explained that, to him, it meant that she was settling into her new job. Nelson also testified that, at a faculty meeting, Dr. Buxton made a comment about her brain surgery, saying that "the problem with [Nelson] was that [she] was too smart. That that's why [she] had to have brain surgery so they could take out part of [her] brain so [she] would be like all the other women in the world." Although Hetzler, who was present at the faculty meeting, testified that he remembered the comment, Dr. Buxton denied making it. Nelson indicated that she felt degraded by the comment and, thereafter, was uncomfortable at faculty meetings.

In October 1994, Nelson organized a joint conference between the National Association for Girls and Women in Sport and the Hawai'i State Association for Health, Physical Education and Recreation and Dance educators. Allegedly, Drs. Ho and Buxton were displeased and skeptical about the conference and her participation in it, and Dr. Buxton asked Nelson whether "this [was] going to be a women's conference? Is this for women only?" Nelson claimed that her relationship with Dr. Ho further deteriorated after the conference.

Nelson stated that, around November or December 1994, she had several meetings with Ho about disparities in teaching credit distribution between her and other male professors,[3] work load issues, and her treatment by Dr. Buxton. Dr. Ho allegedly yelled at her several times and told her that she "wasn't grounded" in what she was saying. Dr. Ho admitted having a three-hour meeting with Nelson during that time period, but denied having an argument. Dr. Ho also denied that Nelson told him about Dr. Buxton making inappropriate comments to her.

Nelson testified that, in December 1994, Dr. Buxton told her and two other male professors that she would be "canned." Het-

zler also admitted telling Nelson about rumors that she would be fired. Dr. Buxton denied telling Nelson that she would be fired; however, he admitted that he had a conversation with another faculty member, Dr. Langford, in which they discussed the fact that the personnel committee was probably struggling with her contract renewal.

Sometime between January 3 and 10, 1995, Nelson went to the Dean of the College of Education to discuss her concerns about disparate treatment and her problems with Dr. Ho. According to Nelson, the Dean listened to her concerns and suggested that Nelson address her concerns to Dr. Ho in writing. Shortly afterward, Nelson was told by Dr. Ho that her annual contract renewal evaluation would be conducted in January, two months earlier than she anticipated based on her previous years' experience and what she believed was the policy with respect to other faculty. Although Nelson's contract was renewed for another year by a four-to-one vote of the personnel committee, she received negative comments about her performance. Dr. Ho's independent evaluation of Nelson reflected his concerns about her lack of publication in a peer-reviewed journal, referred to as a "refereed journal."

Nelson testified that, prior to her evaluation and while at the University, she wrote and published an instructor's manual on Human Motor Development that was "on the shelves" in January 1995. She also testified that she published several papers and gave presentations at the University, obtained grants, and published state performance standards for physical education for use by the Hawai'i Commission on Performance Standards for the University.

Nelson also claimed that, in January 1995, she had an epileptic seizure for the first time since her brain surgery in 1990 and that, thereafter, her health began to deteriorate due to the stress of the discriminatory treatment. As previously stated, Nelson filed a formal complaint with the University's EEO office in February 1995 and eventually filed a

---

3. For example, Nelson stated that she got into an argument with Dr. Ho because he had asked her to lie about student teaching assignments. She also objected to giving male professors, who were not teaching as many hours as they should, two credits for student teaching, while giving her only one credit for "doing all the student supervision." Dr. Ho denied ever asking Nelson to lie.

charge of discrimination with the HCRC and the EEOC in July 1995. Dr. Ho claimed that, after February 1995, he did not participate in distributing Nelson's teaching assignments because he was told that the Dean's office would be taking over this task.

Nelson claimed that, in 1995 and 1996, the University denied several requests for accommodations for her disability and that the discriminatory treatment continued. On cross-examination, Nelson admitted that several of her requests, such as a reduction in work load and relocating her office away from Dr. Buxton, were granted. Her contract was not renewed in 1996. Nelson claimed that she has been unable to work since she left the University in 1997 and that she was living on "Social Security disability."

Dr. Mary Ann Prater (Dr. Prater), formerly chair of the Department of Special Education, testified that she was asked to be substitute chair of the HPER department personnel committee reviewing Nelson's contract renewal, in 1996 because the HPER department needed an external evaluator. Dr. Prater stated that she recommended renewal because Nelson had submitted articles for "referee review," had written a book, had written a grant application for external funding, and her teaching evaluations were positive.

Nelson's psychiatrist, Shepard Ginandes, M.D. (Dr. Ginandes), who had been treating Nelson since 1995, testified that Nelson had a seizure disorder that could be triggered by stress and depression and opined that her seizures returned in 1995 as a result of stress and the episodes, as described by Nelson, involving Drs. Ho and Buxton. Nelson suffered from major depression, panic attacks, and seizures that posed a major risk to her health. Dr. Ginandes testified that Nelson was now "totally disabled" because of "the stress she was subjected to in her job at the University." He claimed that Nelson was not only unable to return to work at the University, but "unable to work in any work

place." She also would experience pain and suffering in the future for the rest of her life. Further, Dr. Ginandes stated that Nelson had an outstanding bill at his office, her medical bills for services were about $10,000 per year, and her medication costs ranged from $300 to $500 per month.

In addition to Drs. Ho and Buxton, who denied most of Nelson's allegations, *see* discussion *supra*, Defendants called several faculty members to testify. Charles T. Araki, former interim dean of the College of Education, testified that he reviewed the HPER department personnel committee's recommendations regarding Nelson's contract renewal in 1996 and that Nelson's contract was not renewed because of her "lack of publication." The court admitted into evidence a letter written by Araki to Nelson informing her of her nonrenewal. Nelson objected to the admission of a memorandum to Araki from the personnel committee regarding its recommendations for nonrenewal, apparently based on the trial court's prior ruling on the motion in limine regarding evidence of the nonrenewal, but the memorandum was eventually admitted into evidence.[4]

Defendants also called Boyd Slomoff, M.D. (Dr. Slomoff), a psychiatrist who had conducted an independent medical examination (IME) of Nelson in March 1997 and had reviewed her medical history. Dr. Slomoff testified that Nelson had a history of depression and opined that she suffered from an occupational problem and an adjustment disorder, which he also referred to as a personality disorder, but that she was capable of working.

After Defendants called their last witness, Nelson proffered rebuttal evidence of Nelson's publications between 1995 and 1996 to challenge Defendants' explanation for the nonrenewal of her contract in 1996. Nelson also sought to recall Dr. Ginandes to counter Dr. Slomoff's testimony. Defendants argued that Nelson should have brought out this

---

**4.** The memorandum summarized Nelson's instructional, research, scholarly, and service activities, as well as her professional and personal qualities. Negative comments focused on her lack of publications and her "personal qualities." These comments included statements that

"Nelson has chosen to isolate herself from her colleagues" and has "little direct colleague collaboration with any other department member regarding interdepartmental business or research."

evidence in her case-in-chief. The court denied Nelson's request to present additional evidence in rebuttal.

In closing argument, Nelson claimed damages in the amount of $300,000 for medical services, $108,000 for medication, $62,000 for lost wages, $940,000 for future loss of income, and $900,000 for general pain and suffering.

During the settling of jury instructions, the trial court refused six of Nelson's supplemental instructions regarding the elements and definition of sexual harassment. Instead, the trial court gave Defendants' requested instructions on sexual harassment.

## C. Verdict

On December 16, 1998, the jury returned a verdict, awarding Nelson $50,000 in general damages for NIED, but found in favor of Defendants on all other claims. On December 18, 1998, Defendants filed a motion for JNOV, and Nelson filed a motion for new trial or to amend the judgment. On December 28, 1998, the trial court granted Defendant's motion for JNOV, dismissed the NIED claim, and denied Nelson's motion for new trial. Judgment was entered in favor of Defendants, and Nelson's timely appeal followed.

## II. DISCUSSION

### A. Admissibility of Rebuttal Evidence

Nelson contends that the trial court abused its discretion by denying her request to present rebuttal evidence to show that Defendants' proffered reason for the nonrenewal of her contract in 1996, i.e., lack of publication, was a pretext and to refute Dr. Slomoff's testimony regarding Nelson's ability to work. Defendants argued that such evidence was "just rehashing what has already been submitted or should have been submitted to the [c]ourt in [Nelson's] case-in-chief." The court disallowed Nelson's proffered rebuttal evidence, stating, in pertinent part, as follows:

[R]ebuttal evidence is evidence which is used to rebut evidence introduced primarily by the opposing party in which ... the plaintiff ... in essence would have been surprised by what it has. In other words, that you had no idea that the evidence that was being brought forth was going to be brought forth by the defendants. And you did not have an opportunity to either discover it or to introduce any evidence in your [case-in-chief] to counteract it.

And, obviously, what you have proposed now is not rebuttal evidence as far as this [c]ourt is concerned. So, accordingly, I'm precluding your proffered rebuttal evidence.

"In civil trials generally, the introduction of evidence in rebuttal and in surrebuttal is a matter within the discretion of the trial court and appellate courts will not interfere absent a[n] abuse thereof." *Housing Finance and Dev. Corp. v. Ferguson*, 91 Hawai'i 81, 93, 979 P.2d 1107, 1119 (1999) (internal quotation marks omitted); *see also Ditto v. McCurdy*, 86 Hawai'i 84, 87, 947 P.2d 952, 955 (1997); *Takayama v. Kaiser Foundation Hosp.*, 82 Hawai'i 486, 495, 923 P.2d 903, 912 (1996). In order to determine whether there has been an abuse of discretion, we must examine the sequence of the trial. *Takayama*, 82 Hawai'i at 496, 923 P.2d at 913. This court has recognized three general rules with respect to the admission of rebuttal evidence. First, as a general rule, a party is bound to give all available evidence in support of an issue in the first instance it is raised at trial and will not be permitted to hold back evidence confirmatory of his or her case and then offer it on rebuttal. *See id.* at 497, 923 P.2d at 914. "Second, this general rule does not necessarily apply where the evidence sought to be presented on rebuttal is 'negative of a potential defense,' even if the evidence is also confirmatory of an affirmative position upon which the party seeking to present the evidence bears the burden of proof." *Id.* Third, although a plaintiff is not required to call, during his or her case-in-chief, every conceivable witness who might contradict a potential defense witness, it is also generally true that

[a] party cannot, as a matter of right, offer in rebuttal evidence which was proper or should have been introduced in chief, even though it tends to contradict the adverse party's evidence and, while the court may in its discretion admit such evidence,

it may and generally should decline to admit the evidence.

*Id.* (citations omitted).

 Nelson's proffered evidence of her publications was "confirmatory of her case" in that it tended to prove that she fulfilled her research responsibilities, worked in collaboration with colleagues, and made progress toward publications as recommended in her 1995 evaluation and that, therefore, the negative evaluations and adverse employment decisions were based on discrimination or retaliation rather than on her performance. The evidence also specifically rebutted Defendants' claims that Nelson was terminated because she did not fulfill her duties and that she was not entitled to damages for her loss of income. Some of Nelson's proffered rebuttal evidence, which included an article co-authored with another member of the faculty, also specifically rebutted negative comments made in the personnel committee's evaluation, *e.g.*, that Nelson "has chosen to isolate herself from her colleagues[.]" *See supra* note 4.

5. There was some evidence, however, regarding the nonrenewal of her contract in 1996 inasmuch as Dr. Prater did testify, *inter alia*, that she recommended Nelson for renewal in 1996.

6. Nelson also argues that, based on the burden-shifting framework for analyzing the development of proof in employment discrimination cases set forth in *Furukawa v. Honolulu Zoological Society*, 85 Hawai'i 7, 12–13, 936 P.2d 643, 648–49 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)), *reconsideration denied*, 85 Hawai'i 7, 936 P.2d 643 (1997), she was entitled to present rebuttal evidence to establish that Defendants' proffered reasons for not renewing her contract were merely pretextual. In *Furukawa*, this court described the three-part framework as follows:

> First, the plaintiff must demonstrate by a preponderance of the evidence that there was discrimination on the basis of a protected characteristic. Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee. The burden of production then shifts to the defendant to proffer a legitimate, nondiscriminatory explanation of the adverse employment action. Finally, if a defendant successfully rebuts the presumption, the burden returns to the plaintiff, to show that the defendant's explanation was pretextual. The burden of persuasion remains at all times on the plaintiff.

Because the trial court's ruling on the motion in limine ostensibly precluded evidence of the 1996 contract renewal process, we cannot conclude that Nelson "held back" confirmatory evidence of her case. Moreover, it is unreasonable to suggest that Nelson should have anticipated that Defendants would present specific evidence of the 1996 contract renewal process—especially in light of their motion in limine—or that they would be allowed, over objection, to introduce the 1996 personnel committee's evaluation of Nelson. Although she presented some evidence of her publications during her case-in-chief, it was introduced primarily in the context of refuting Dr. Ho's 1995 negative evaluation and discussing her work load generally.[5] In our view, the trial court's ruling unreasonably precluded Nelson from presenting any rebuttal evidence to specifically refute Defendant's purported reasons for not renewing her contract. Further, the exclusion of such evidence could have contributed to the jury's verdict regarding Nelson's claims of employment discrimination based on sex and disability and her claim of damages for infliction of emotional distress.[6]

*Furukawa*, 85 Hawai'i at 12–13, 936 P.2d at 648–49 (internal quotations and citations omitted). Defendants contend that, because the trial court had properly precluded Nelson from presenting evidence regarding the nonrenewal as a separate claim for relief or adverse action, the burden-shifting framework was not applicable. However, we need not decide this issue because, assuming *arguendo* that the burden-shifting framework was not applicable to the nonrenewal as an independent adverse action, the trial court nonetheless abused its discretion by excluding Nelson's proffered rebuttal evidence. Nelson's proffered rebuttal evidence was relevant to her discrimination claims based on her treatment while at the University and her claim for damages and, as discussed above, the trial court permitted Defendants to introduce evidence of the nonrenewal over objection.

Although the trial court's ruling on the motion in limine was not raised as a separate point of error on appeal, the admissibility of evidence of the 1996 contract renewal process is related to other issues raised on appeal, and we believe that some guidance on remand is appropriate. In support of the motion to exclude evidence of the 1996 contract renewal process, Defendants argued that such evidence was not admissible in part because Nelson failed to file a charge of discrimination with the HCRC based on the nonrenewal, which precluded the court from considering the nonrenewal as part of the discrimina-

Based on the foregoing, we hold that the trial court abused its discretion in excluding Nelson's proffered rebuttal evidence with respect to her publications and that the exclusion of such evidence prejudiced Nelson with respect to her claims for employment discrimination and infliction of emotional distress.

■ At trial, Nelson also sought to recall Dr. Ginandes in rebuttal to refute Dr. Slomoff's testimony that Nelson was able to continue working in March 1997. Specifically, Nelson proffered rebuttal included Dr. Ginandes' testimony that: (1) he reported Nelson's disability to the Social Security Office, and Nelson is now on disability; (2) stated the reasons why he disagreed with Dr. Slomoff's opinion that Nelson was able to work in 1997 and 1998; (3) although Nelson had had prior bouts of depression, she was able to work during the prior bouts because they were not as severe as the emotional distress she suffered due to Defendants' actions; (4) he reported Nelson's job restrictions to the University; and (5) his medical opinion is based on a longstanding relationship with Nelson, in contrast to the two-hour interview conducted by Dr. Slomoff. Defendants argued that Nelson should have presented all of the foregoing evidence in her case-in-chief because she was given Dr. Slomoff's IME report prior to trial, no new evidence was introduced by Defendants, and Dr. Ginandes had already testified as to his treatment of Nelson and her history of depression. We agree with Defendants.

The proffered rebuttal testimony of Dr. Ginandes was clearly confirmatory of Nelson's case and supported her claim for damages. However, unlike her proffered evidence to rebut the Defendants' reasons for not renewing her contract, Nelson could and should have presented such evidence in her case-in-chief. Indeed, Dr. Ginandes had already testified as to his treatment of Nelson,

her depression, and why he believed she was unable to work. With respect to evidence that Nelson was on disability, there is no indication that this evidence was "new" or could not have been introduced earlier, Nelson herself testified that she was on "Social Security disability," and Nelson should have presented all available evidence in support of damages in her case-in-chief. *See Takayama,* 82 Hawai'i at 496–97, 923 P.2d at 913–14. Thus, we hold that the trial court did not abuse its discretion in denying Nelson's request to recall Dr. Ginandes in rebuttal.

### B. *Jury Instructions*

Nelson contends that the trial court erred in instructing the jury regarding the sexual harassment claim by giving Defendants' requested instruction No. 9 [hereinafter, instruction No. 9], quoted *infra,* and failing to give her requested supplemental instructions.[7] Nelson claims that instruction No. 9 was "verbose, jumbled, and confusing" and misstated the law regarding sexual harassment.

■ "When jury instructions, or the omission thereof, are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *Hirahara v. Tanaka,* 87 Hawai'i 460, 462, 959 P.2d 830, 832, *reconsideration denied,* 87 Hawai'i 460, 959 P.2d 830 (1998) (citing *Craft v. Peebles,* 78 Hawai'i 287, 302, 893 P.2d 138, 153 (1995)). "Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *Id.* at 463, 959 P.2d at 833 (citing *Tabieros v. Clark Equip. Co.,* 85 Hawai'i 336, 350, 944 P.2d 1279, 1293 (1997)).

---

tion claim. However, we note that HRS § 378–3(10) (Supp.1994), *see infra* note 16 and accompanying text, excepts victims of sexual harassment from having to file discrimination complaints with the HCRC prior to filing civil actions for sexual harassment or infliction of emotional distress related thereto.

7. The court rejected Nelson's proposed supplemental instructions Nos. 9, 12, and 13, which defined the elements of Nelson's sexual harassment claim against the University, Dr. Buxton, and Dr. Ho, respectively, as well as instructions Nos. 46, 47, and 48, which addressed the meaning of the term "motivating factor."

### 1. *Hawaiʻi Law*

 Nelson brought a sexual harassment claim pursuant to HRS § 378–2, which provides:

> It shall be an unlawful discriminatory practice ... [b]ecause of ... sex ... [f]or any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment[.]

Sexual harassment is a form of sex discrimination prohibited by HRS § 378–2. *See* Hawaiʻi Administrative Rules (HAR) § 12–46–109(a) (1998). Generally, there are two different forms of sexual harassment: "quid pro quo" and "hostile environment." *See Steinberg v. Hoshijo*, 88 Hawaiʻi 10, 18 n. 11, 960 P.2d 1218, 1226 n. 11, *reconsideration denied*, 88 Hawaiʻi 10, 960 P.2d 1218 (1998); *Ellison v. Brady*, 924 F.2d 872, 875 (9th Cir.1991); *see also* HAR § 12–46–109(a). "Quid pro quo" cases generally involve allegations that an employer conditioned employment benefits on sexual favors. *Ellison*, 924 F.2d at 875. "Hostile environment" sexual harassment (HESH) is defined as:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or visual forms of harassment of a sexual nature constitute sexual harassment when ... [t]hat conduct has the purpose or effect of unreasonably interfering with an individual's work performance *or* creating an intimidating, hostile, or offensive working environment.

HAR § 12–46–109(a)(3) (emphases added). The aforementioned definition of HESH is virtually identical to the corresponding federal regulations under Title VII of the Civil Rights Act,[8] adopted by the EEOC. *See* 29 C.F.R. § 1604.11(a)(3) (2000).

 This court has held that a HESH claim exists when an employee can show:

1. that he or she was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature,

2. that this conduct was unwelcome; and

3. that the conduct had the purpose or effect of either:

 a. *unreasonably interfering with an individual's work performance* **or**

 b. *creating an intimidating, hostile, or offensive work environment.*

*Steinberg*, 88 Hawaiʻi at 18, 960 P.2d at 1226 (citing HAR § 12–46–109) (emphases added). The aforementioned holding in *Steinberg* tracks the language of HAR § 12–46–109(a)(3) and makes clear that a plaintiff can establish a claim by showing that the alleged sexual conduct had the purpose or effect of either (a) unreasonably interfering with work performance, *or* (b) creating an intimidating, hostile, or offensive work environment.

 In addition to the foregoing elements, a plaintiff is also required to establish that the harassing conduct was "severe or pervasive." *See Steinberg*, 88 Hawaiʻi at 18, 960 P.2d at 1226. However, in discussing this "severe or pervasive" requirement, state and federal courts and agencies have used somewhat inconsistent language. For example, based on federal case law interpreting Title VII, *Steinberg* discussed the perspectives to be used in evaluating a HESH claim as follows:

> [T]he perspective to be used is that of the victim. Thus, if the complainant is a woman, the objective standard is met if a reasonable woman would consider such conduct <u>sufficiently **severe or pervasive** to alter the conditions of employment **and** either [ (a) ] unreasonably interfere with work performance **or** [ (b) ] create an intimidating, hostile, or offensive work environment.</u>

*Id.* at 18, 960 P.2d at 1226 (emphases added) (citing, *inter alia, Ellison*, 924 F.2d at 878–79.) The language in *Steinberg*, setting forth the "severe or pervasive" requirement (see underscored text above), although not incorrect, is different from the standard discussed in *Ellison*. *See Ellison*, 924 F.2d at 879 (stating that a plaintiff must show that conduct was "sufficiently severe or pervasive to alter the conditions of employment **and** create an abusive working environment").

---

8. *See* Civil Rights Act of 1964, § 701 *et seq.*, as amended, 42 U.S.C. § 2000e *et seq.* (1994).

The required showing has also been described by the HCRC as follows:

> The conduct was sufficiently *severe or pervasive* to alter the conditions of employment, *such as* having the purpose or effect of [ (a) ] unreasonably interfering with an individual's work performance *or* [ (b) ] by creating an intimidating, hostile or offensive working environment.

*Santos v. Niimi,* No. 91–001–E–SH at 2 (HCRC Final Decision Jan. 25, 1993) (adopting conclusions of law from Proposed Decision Nov. 4, 1992 at 27) (citing, *inter alia,* HAR § 12–46–109(a)(3); *Ellison, supra* ).

Nelson contends that instruction No. 9 was misleading and misstated Hawai'i law by, *inter alia,* stating that Nelson had to prove that the conduct had the "purpose or effect" of *both* "altering the conditions of [Nelson's] employment **and** creating an intimidating, hostile, abusive, or offensive working environment." Nelson essentially argues that, inasmuch as the term "alter the conditions of employment" is similar to alternative (a) ("unreasonably interfering with work performance"), instruction No. 9 improperly suggested that Nelson was required to prove both (a) and (b). Defendants recognize that instruction No. 9 used language different from that used in Hawai'i courts and by the HCRC in describing the required showing, but maintain that the difference is immaterial. Defendants contend that the trial court correctly instructed the jury based on the United States Supreme Court's decision in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), which requires the plaintiff to establish that the alleged conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment **and** create an abusive environment." *See id.* at 67, 106 S.Ct. 2399 (internal quotations and brackets omitted) (bold emphasis added); *see also Ellison,* 924 F.2d at 879.

Because the language used in both state and federal case law to describe the required showing is somewhat inconsistent, we believe that it is necessary to review the development of the "severe or pervasive" requirement found in the federal case law and relied upon by this court in *Steinberg.*

## 2. *Federal case Law*

Generally, federal case law affirms the EEOC regulations defining sexual harassment, which are nearly identical to Hawaii's regulations, making clear that a claimant must show that the alleged conduct had the "the purpose or effect of [ (a) ] unreasonably interfering with an individual's work performance *or* [ (b) ] creating an intimidating, hostile, or offensive working environment" and that (a) and (b) describe two discrete methods of establishing a claim. *See, e.g., Ellison,* 924 F.2d at 876 (citing 29 CFR § 1604.11(a)(3)) (emphasis added); *Meritor Savings Bank,* 477 U.S. at 65, 106 S.Ct. 2399. Federal case law also adds two requirements to the elements of a HESH claim: (1) that the conduct be severe or pervasive; and (2) that the conduct be evaluated both from the subjective standpoint of the claimant and from the objective standpoint of a reasonable person of the claimant's gender in the claimant's position. *See* discussion *infra.* However, the federal courts have used varied and sometimes confusing language to describe the elements of a HESH claim.

The federal court in *Ellison* affirmed the definition of HESH, set forth in the EEOC regulations, as unwelcome sexual conduct that has "the purpose or effect of unreasonably interfering with an individual's work performance *or* creating an intimidating, hostile, or offensive working environment." 924 F.2d at 876 (citing 29 CFR § 1604.11(a)(3)) (emphasis added). In addition, *Ellison* provided that the claimant must establish that the conduct was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *See id.* at 879; *see also Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The "severe or pervasive" requirement discussed in *Ellison* and other federal cases must be read in context.

Although not clearly articulated, the court in *Ellison* discussed the "severe or pervasive" requirement in the context of balancing the need to evaluate the harasser's conduct from the viewpoint of the victim, which often requires an analysis of the different perspec-

tives of men and women,[9] and the need to ensure that employers are not held liable for trivial occurrences. 924 F.2d at 878–79. The court stated that,

> [i]n order to shield employers from having to accommodate the idiosyncratic concerns of the rare hyper-sensitive employee, we hold that a female plaintiff states a prima facie case of hostile environment sexual harassment when she alleges conduct which a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.

*Id.* at 879. The court in *Ellison* found no inconsistency between the "severe or pervasive" requirement and the EEOC regulations. *Id.* at 877 (citing *Meritor Savings Bank, supra* ). Indeed, there is no conflict between the regulations and the requirement that a claimant show the conduct was "sufficiently severe or pervasive to alter the conditions of employment" because the phrase "alter the conditions of employment" is merely a general reference to the statutory prohibition against discrimination in the "terms, conditions, or privileges of employment," *see* HRS § 378–2, *supra*, rather than a reference

to the "interference with work performance" element in the regulations.[10]

██ The addition of the "severe or pervasive" requirement to the regulations did not change the two discrete methods of establishing a claim described in the regulations: showing that the harasser's conduct had the purpose or effect of (a) unreasonably interfering with performance *or* (b) creating an intimidating, hostile or offensive environment. In other words, by stating that conduct must be "sufficiently severe or pervasive to alter the conditions of employment **and** create an abusive working environment[,]" *see, e.g., Ellison,* 924 F.2d at 879, we do not believe that the federal case law intended to change the *"or "* to an *"and."* Under *Ellison,* unwelcome sexual conduct that has the effect 'of "unreasonably interfering with work performance," can, by itself, establish a prima facie case. *See* 924 F.2d at 877; *see also Harris,* 510 U.S. at 22, 114 S.Ct. 367 (distinguishing tangible interference with work performance from the creation of an abusive environment, describing these two concepts as alternative ways of establishing a claim).[11]

---

9. The court emphasized that, "in evaluating the severity and pervasiveness of sexual harassment, we should focus on the perspective of the victim. If we only examined whether a reasonable person would engage in allegedly harassing conduct, we would run the risk of reinforcing the prevailing level of discrimination." *Ellison,* 924 F.2d at 878 (citations omitted). The court recognized that:

> [a] complete understanding of the victim's view requires, among other things, an analysis of the different perspectives of men and women. Conduct that many men consider unobjectionable may offend many women.

*Id.* at 878–79 (citations and footnotes omitted).

10. We note that a number of federal decisions following *Ellison* have defined the elements of a HESH claim in several different ways, using specific language from the regulations and *Ellison* interchangeably and somewhat inconsistently. *See, e.g., Fenton v. HiSAN,* 174 F.3d 827, 829–30 (6th Cir.1999) (describing the required showing as conduct that "unreasonably interfered with the plaintiff's work performance **or** created a hostile or offensive work environment that was severe or pervasive" (citing, *inter alia, Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)) (bold emphasis added)); *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir.2000) (describing the "severe or pervasive" requirement as the

objective standard to be used in evaluating the claim).

11. In *Harris,* the United States Supreme Court stated that

> [a] discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' *job performance,* discourage employees from remaining on the job, or keep them from advancing in their careers. *Moreover, even without regard to these tangible effects,* the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their ... gender ... offends Title VII's broad rule of workplace equality.

510 U.S. at 22, 114 S.Ct. 367. We further note that an individual may be subjected to a hostile environment (*e.g.,* threats, intimidation, offensive remarks), but continue to "perform" well, even if he or she is performing under additional stress. Such an individual is not precluded from claiming sexual harassment. *Cf. Harris,* 510 U.S. at 25, 114 S.Ct. 367 (Ginsberg, J., concurring) (In order to show that conduct unreasonably interfered with work performance, a "plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment."

■ Further, it is the *harasser's conduct* which must be severe or pervasive, "not its effect on the plaintiff or on the work environment." *Hurley v. Atlantic City Police Dept.*, 174 F.3d 95, 115 (3d Cir.1999) (citing, *inter alia, Ellison*, 924 F.2d at 878); *Equal Employment Opportunity Comm'n v. Mitsubishi Motor Mfg. of Am., Inc.*, 990 F.Supp. 1059, 1074 n. 6 (C.D.Ill.1998). The focus on the harasser's conduct is also evident from the statement by the court in *Ellison* that "the required showing of severity or seriousness *of the harassing conduct* varies inversely with the pervasiveness or frequency *of the conduct.*" *See Ellison*, 924 F.2d at 878 (emphases added) (citations omitted). Essentially, the "severe or pervasive" requirement reflects a general concern that an employer not be held liable for trivial conduct. *See, e.g., Faragher*, 524 U.S. at 788, 118 S.Ct. 2275 ("A recurring point in [federal cases] is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (Citations omitted.)). Despite some of the confusing and inconsistent language used in describing the required showing for a HESH claim, when read in context, the federal decisions support the definition of harassment set forth in the EEOC and the HCRC regulations and do not actually conflict with Hawai'i law.

■ Notwithstanding the above, this court need not resolve any inconsistencies in the federal case law. Nor would it be wise for us to import such confusing or inconsistent language into our case law. Moreover, although "the federal courts' interpretation of Title VII is useful in construing Hawai'i employment discrimination law[,]" *Sam Teague, Ltd. v. Hawai'i Civil Rights Comm'n*, 89 Hawai'i 269, 281, 971 P.2d 1104, 1116 (1999), it is not controlling.

(Citing *Davis v. Monsanto Chemical Co.*, 858 F.2d 345, 349 (6th Cir.1988))). The Supreme Court has also recognized that, "[s]o long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious." *Harris*, 510 U.S. at 22, 114 S.Ct. 367 (citations omitted). "[T]itle VII comes into play before the harassing conduct leads to a nervous breakdown." *Id.*
The Court in *Harris* went on to state that

### 3. *Elements of a Claim*

■ Based on the foregoing, we take this opportunity to clarify the elements of a HESH claim set forth in *Steinberg* and hold that, in order to establish a HESH claim, the claimant must show that: (1) he or she was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct or visual forms of harassment of a sexual nature; (2) the conduct was unwelcome; (3) the conduct was *severe or pervasive*; (4) the conduct had the *purpose or effect* of either: (a) *unreasonably interfering with the claimant's work performance,* **or** (b) *creating an intimidating, hostile, or offensive work environment;* (5) the claimant actually perceived the conduct as having such purpose or effect; and (6) the claimant's perception was objectively reasonable to a person of the claimant's gender in the same position as the claimant.

■ In addition, with regard to the third element of the claim, we observe that the required showing of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct. For example, a single severe act can be enough to establish a claim, and multiple incidents, each of which may not be severe when considered individually, can be enough to establish a claim when evaluated collectively.

■ Moreover, we emphasize that, to establish the last two elements of a HESH claim, it is not necessary for the claimant to prove that he or she has suffered tangible physical or psychological harm: the claimant's *perception* is the harm as long as the perception is objectively reasonable. *See Harris, supra.*

■ Finally, we emphasize that, in evaluating a HESH claim for purposes of dismiss-

[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.
510 U.S. at 21–22, 114 S.Ct. 367.

al, summary judgment or judgment as a matter of law, or in instructing juries, courts must "look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred." *Steinberg*, 88 Hawai'i at 18, 960 P.2d at 1226 (citing HAR § 12–46–109(b)[12]). The "clarified" standard set forth above is consistent with HAR § 12–46–109(a) and the HCRC's interpretation of the law, *see* discussion *supra*, which should be given due deference. *See Hyatt Corp. v. Honolulu Liquor Comm'n*, 69 Haw. 238, 242–43, 738 P.2d 1205, 1208 ("[It] is a well established rule of statutory construction that, where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous." (Brackets in original.)), *reconsideration denied*, 69 Haw. 238, 738 P.2d 1205 (1987). This "clarified" standard is not only consistent with federal law, but, at the same time, avoids the confusing language contained in some of the federal cases.[13]

### 4. *Application of the Correct Standard*

In this case, the court instructed the jury that the plaintiff must show that the employer

engaged in harassing conduct directed toward the plaintiff; *that sex was a motivating factor* for the harassment; that this conduct was unwelcome and sufficiently severe or pervasive that it had *the purpose or effect of altering the conditions of Plaintiff's employment and creating an intimidating, hostile, abusive, or offensive working environment;* the environment created by the conduct would have been perceived as intimidating, hostile, abusive, or offensive by a reasonable person in the same position as Plaintiff; that Plaintiff did in fact perceive the environment as intimidating, hostile, abusive or offensive; and this environment caused plaintiff injury, damage, loss, or harm.

In order to prevail on a claim of discrimination in the terms and conditions of employment, Plaintiff has the burden of establishing by a preponderance of the evidence that the "terms, conditions or privileges of employment" were altered by creating a work environment that was hostile or abusive. *Mere isolated incidents of harassment are not sufficient.*

In determining whether an environment is hostile or abusive, you must consider all the circumstances. These may include frequency of the discriminatory conduct; its severity; whether it is physically threaten-

---

12. HAR § 12–46–109(b) provides as follows:

In determining whether alleged conduct constitutes sexual harassment, the commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.

13. Justice Ramil, in his dissent, refers to the majority's approach as the "separate element/alternative means" approach and suggests that it is not necessary to prove the fourth element identified above in order to establish a HESH claim. Considering the fourth element, Justice Ramil concludes that neither (a), *i.e.*, unreasonably interfering with an individual's work performance, nor (b), *i.e.*, creating an intimidating, hostile, or offensive work environment, must be proven, but that (a) and (b) are merely "factors" to be considered in determining whether, based on the totality of the circumstances, the conduct was

"sufficiently 'severe or pervasive' to qualify as a HESH claim." Dissent at 395–96, 38 P.3d at 114–15. We disagree. Both federal and state case law make clear that a claimant must establish that the conduct had the purpose or effect of either (a) or (b). *See* discussion *supra*. Without this requirement, there would be no legal standard by which to evaluate whether a defendant's alleged conduct altered the "terms, conditions or privileges of employment"—which is, after all, a necessary showing under the statute. *See* HRS § 378–2. Concluding, as Justice Ramil does, that courts should look to the "totality of the circumstances" does not create such a standard; it invites courts and juries to create their own standards without reference to the law.

Correctly viewed, our approach is consistent with the "totality of the circumstances" approach adopted by the HCRC. *See supra* note 12. In other words, courts must consider the totality of the circumstances when determining *whether* a claimant has established (a) or (b), as well as the other elements of a HESH claim.

ing or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with Plaintiff's work performance.

Instruction No. 9. As previously stated, Nelson contends that the foregoing Instruction No. 9 was confusing and erroneous. For the reasons set forth below, we agree with Nelson.

■ First, the trial court instructed the jury, without clarification, that the plaintiff must show that "sex was a motivating factor for the harassment." Instruction No. 9 incorrectly implies that the plaintiff must show that the offender was motivated by a desire to have sex with the victim. See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ("[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex."). Inasmuch as Nelson admitted that neither Dr. Ho nor Dr. Buxton made any sexual advances toward her, this instruction could have affected the jury's verdict.

■ Second, Instruction No. 9 did not accurately reflect the elements of a HESH claim under Hawai'i law. See Steinberg, 88 Hawai'i at 18, 960 P.2d at 1226; HAR § 12-46-109(a)(3); see also supra section II.B.3. Nelson was required to establish, as one element of a HESH claim, that the alleged conduct had the purpose or effect of either (a) unreasonably interfering with work performance, or (b) creating an intimidating, hostile or offensive work environment. Id. Nelson was not required to prove any tangible effect upon her work or alteration in the condition of her employment in addition to the creation of an intimidating, hostile or offensive work environment. See, e.g., Harris, supra note 11 and accompanying text. Instruction No. 9 indicated that Nelson was

required to prove that the conduct had the purpose or effect of both altering the conditions of employment and creating an intimidating, hostile, abusive, or offensive working environment. Thus, the instruction may have led the jury to believe, incorrectly, that Nelson was required to prove some alteration in the conditions of employment beyond the creation of a hostile, abusive, or offensive work environment.

■ Lastly, by instructing the jury that "[m]ere isolated incidents of harassment are not sufficient," the court incorrectly suggested that a single act, even if it was severe, could not establish a claim. See Ellison, 924 F.2d at 878 ("[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct.") (Citing, inter alia, King v. Board of Regents of Univ. of Wisconsin Sys., 898 F.2d 533, 537 (7th Cir. 1990) (stating that "a single act can be enough")).

Based on the foregoing, we hold that the trial court's jury instruction regarding the elements of a HESH claim, when considered as a whole, was prejudicially erroneous and misleading.

### C. JNOV

■ As previously stated, the jury returned a verdict in favor of Nelson on her NIED claim and awarded Nelson $50,000 in damages. Defendants' moved for JNOV pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 50(b) (1980),[14] seeking to set aside the verdict and have judgment entered in their favor by arguing that Nelson's NIED claim was barred by the exclusive remedy provision of the workers' compensation law, i.e., HRS § 386-5 (1993), quoted infra. The trial court agreed and granted Defendants'

---

14. We note that HRCP Rule 50 was recently amended and no longer refers to motions for directed verdict or for JNOV. HRCP Rule 50 (2000). The new rule, consistent with the Federal Rules of Civil Procedure (FRCP) Rule 50 (as amended in 1991), refers to motions for "judgment as a matter of law," and motions made after trial are referred to as "renewed motions for judgment as a matter of law." "Where we have patterned a rule of procedure after an equivalent rule within the FRCP, interpretations of the rule by the federal courts are deemed to be highly persuasive in the reasoning of this court." Gold v. Harrison, 88 Hawai'i 94, 105, 962 P.2d 353, 364 (1998) (citations omitted). The 1991 amendment to the federal rules was not intended to result in a substantive change to existing law. See Wright & Miller, Federal Practice and Procedure, Civil 2d § 2537 (1995). Similarly, the change in terminology in the 1993 amendment to HRCP Rule 50 was not intended to result in a substantive change of existing Hawai'i law.

motion for JNOV. Nelson contends that the trial court erred in granting the motion because HRS § 386-5 does not bar an employee's claim for emotional distress related to sexual harassment.

▮▮▮ It is well settled that a trial court's rulings on directed verdict or JNOV motions are reviewed *de novo*. *In re Estate of Herbert*, 90 Hawai'i 443, 454, 979 P.2d 39, 50 (1999); *see also Torres v. Northwest Eng'g Co.*, 86 Hawai'i 383, 390, 949 P.2d 1004, 1011 (App.1997).

> Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion.
>
> In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment.

*Carr v. Strode*, 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995).

▮▮▮ The trial court's ruling in this case was based on its interpretation of the exclusive remedy provision of the workers' compensation law.

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

*Korsak v. Hawaii Permanente Medical Group*, 94 Hawai'i 297, 303, 12 P.3d 1238, 1244 (2000) (quoting *Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997)). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful

in another." *Credit Assocs. of Maui, Ltd. v. Brooks*, 90 Hawai'i 371, 373, 978 P.2d 809, 811 (1999) (citations omitted); *see also* HRS § 1-16 (1993). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1-15(2) (1993).

▮▮▮ The workers' compensation law covers employees who suffer "personal injury either by accident arising out of and in the course of the employment or by disease proximately caused by or resulting from the nature of the employment[.]" HRS § 386-3(a) (Supp.2000). Generally, the workers' compensation scheme serves to bar a civil action for physical and emotional damages resulting from work-related injuries and accidents. *See Furukawa v. Honolulu Zoological Soc.*, 85 Hawai'i 7, 18, 936 P.2d 643, 654, *reconsideration denied*, 85 Hawai'i 7, 936 P.2d 643 (1997); HRS § 386-5. HRS § 386-5, the exclusive remedy provision, provides as follows:

> **Exclusiveness of right to compensation; exception.** The rights and remedies herein granted to an employee or the employee's dependents on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee, the employee's legal representative, spouse, dependents, next of kin, or anyone else entitled to recover damages from the employer, at common law or otherwise, on account of the injury, *except for sexual harassment or sexual assault and infliction of emotional distress or invasion of privacy related thereto, in which case a civil action may also be brought.*

(Emphasis added.) Defendants contend that the foregoing exception applies only to claims based on intentional conduct and that the legislature did not intend to allow plaintiffs to pursue claims based on negligence. The plain language of the statute contains no such distinction or limitation. However, where there is doubt, this court may look to the legislative history of a statute to aid in its interpretation. *See Gray*, 84 Hawai'i at 148, 931 P.2d at 590.

▮▮▮ HRS § 386-5 was amended in 1992 to include an exception to the exclusive

remedy provision of the workers' compensation law for certain claims related to sexual harassment and sexual assault. *See* 1992 Haw. Sess. L. Act 275, § 2 at 722. Prior to this amendment, in *Lui v. Intercontinental Hotels Corp.*, 634 F.Supp. 684 (D.Haw.1986), the United States District Court for the District of Hawai'i had interpreted the exclusive remedy provision to bar civil actions premised on sexual harassment or sexual assault in the employment context. *Id.* at 688; *see also Furukawa*, 85 Hawai'i at 18, 936 P.2d at 654 (discussing the 1992 amendments). Faced with the foregoing interpretation of HRS chapter 386 and concerns about the procedural limitations contained in HRS chapter 378, which prescribes unlawful discriminatory practices, the legislature passed Act 275. *See* Hse. Conf. Comm. Rep. No. 21, in 1992 House Journal, at 799 ("[HRS § 386–5] has been interpreted as barring a civil action premised on sexual harassment or sexual assault in an employment context. This bill would permit the filing of such an action[.]"); Sen. Stand. Comm. Rep. No. 2588, in 1992 Senate Journal, at 1155; *see also Furukawa*, 85 Hawai'i at 18, 936 P.2d at 654 (discussing Act 275 as a response to "concerns that victims of sexual harassment were often so traumatized by the occurrence that they might fail to file with the commission within 180 days" (internal quotation marks omitted)). Act 275 not only amended HRS § 386–5 to make an exception to the exclusive remedy provision of the workers' compensation law, but it also, *inter alia*,[15] amended Hawaii's HRS chapter 378 (prescribing discriminatory practices) by adding HRS § 378–3(10) (1993), which excepts victims of sexual harassment and sexual assault from having to file discrimination complaints with the HCRC under HRS § 378–4 (1993).[16] 1992 Haw. Sess. L. Act 275, § 1 at 721. The

legislative history confirms that the purpose of Act 275 was "to amend Chapters 378 and 386 ... to enable employees to file civil actions premised on sexual harassment or sexual assault arising out of and in the course of employment." Hse. Conf. Comm. Rep. No. 21, in 1992 House Journal, at 799; *see also* Hse. Stand. Comm. Rep. No. 766, in 1991 House Journal, at 1107 (stating that "persons seeking statutory relief under Hawai'i Workers' Compensation Law should not be precluded from maintaining a cause of action arising out of the same facts as the workers' compensation claim in a court of law"). Thus, Act 275 was enacted for a remedial purpose and must be "construed liberally in order to accomplish the purpose for which it was enacted." *Alvarez v. Liberty House, Inc.*, 85 Hawai'i 275, 278, 942 P.2d 539, 542 (1997) (citing *Flores v. United Air Lines, Inc.*, 70 Haw. 1, 12, 757 P.2d 641, 647 (1988)).

The legislative history further reveals that lawmakers considered and rejected language limiting the emotional distress claims covered by the exception to intentional infliction of emotional distress. The initial version of House Bill No. 2131, introduced in 1991, actually limited the exception to claims based on intentional conduct, proposing the addition of the following subsection to HRS § 386–5:

Nothing in this chapter shall preclude any person from maintaining a cause of action for *intentional* infliction of emotional distress or *intentional* invasion of privacy.

1991 H.B. 2131 (emphases added); *see also* Hse. Stand. Comm. Rep. No. 766, in 1991 House Journal, at 1107. The bill went through several amendments before reaching its final form. *See* H.B. 2131, S.D. 1; H.B.

---

15. In addition, Act 275 amended HRS § 386–8.5, regarding limits on third party liability, to extend the protection from liability afforded to labor organizations to cover liability for failing to negotiate or enforce a sexual harassment or sexual assault provision. *See* Haw. Sess. L. Act 275, § 3 at 722; Conf. Comm. Rep. No. 21, in 1992 House Journal, at 799.

16. HRS § 378–4 provides that the HCRC "shall have jurisdiction over the subject of discriminatory practices made unlawful by this part." HRS § 378–3(10), entitled "Exceptions," pro-

vides that nothing in this part shall be deemed to "[p]reclude any employee from bringing a civil action for sexual harassment or sexual assault and infliction of emotional distress or invasion of privacy related thereto; provided that notwithstanding section 368–12 [regarding notice of right to sue issued by HCRC], the commission shall issue a right to sue on a complaint filed with the commission if it determines that a civil action alleging similar facts has been filed in circuit court."

2131, S.D. 1, C.D. 1; *see also* Sen. Stand. Comm. Rep. No. 2588, in 1992 Senate Journal, at 1155. Although we cannot determine from the legislative history the specific reasons for deleting the "intentional" language, Act 275, in its final form, excepted claims of "infliction of emotional distress" related to sexual harassment, without limitation, from the exclusive remedy provision. 1992 Haw. Sess. L. Act 275, § 2 at 722.

■ Inasmuch as (1) the plain language of the exception in HRS § 386–5 applies to claims for "infliction of emotional distress" without limitation, (2) the exception was a remedial provision that must be construed liberally, and (3) the legislative history does not support limiting the exception to intentional infliction of emotional distress claims, we conclude that the exclusive remedy provision of the workers' compensation law does not bar claims for NIED related to sexual harassment.

■ Here, Nelson's claim for NIED was premised on the same conduct as—and, thus, "related to"—her sexual harassment claim. By agreement of the parties, the court instructed the jury as to the elements of NIED as follows:

> Plaintiff may recover damages for negligent infliction of emotional distress only if she proves that a reasonably prudent person in the same situation and possessing the same knowledge as Defendants would have foreseen that someone in Plaintiff's position would have suffered serious mental distress because of their actions. "Serious mental distress" is found where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress caused by the circumstances of the case. If you find by a preponderance of the evidence that a reasonable person, normally constituted, would have been unable to adequately cope with the mental stress caused by the conduct of Defendants, and that a reasonable person in Defendants' position should have foreseen this, then you may award Plaintiff damages for negligent infliction of emotional distress.

Defendants' Requested Instruction No. 19. (Footnote omitted.) Based on the evidence presented at trial, *see* discussion *supra*, there was substantial evidence, when viewed in the light most favorable to Nelson, to support a finding that she suffered serious mental distress as a result of Defendants' conduct and that such distress was foreseeable. Thus, there was substantial evidence to support the jury's verdict in favor of Nelson on her claim for negligent infliction of emotional distress. *See Carr*, 79 Hawai'i at 486, 904 P.2d at 500. Accordingly, the trial court erred in granting Defendants' motion for JNOV.

## III. *CONCLUSION*

Based on the foregoing, we hold that (1) the trial court abused its discretion in excluding Nelson's proffered rebuttal evidence of her publications, and the exclusion of such evidence resulted in substantial prejudice to Nelson's claims for employment discrimination and negligent and intentional infliction of emotional distress; (2) the trial court's jury instruction with respect to sexual harassment (instruction No. 9) was prejudicially erroneous and misleading; and (3) the trial court erred in granting Defendants' motion for judgment notwithstanding the verdict. Therefore, we vacate the judgment of the circuit court and remand this case for a new trial with respect to Nelson's claims of employment discrimination and negligent and intentional infliction of emotional distress only.

Dissenting Opinion By RAMIL, J.

I write to state my position regarding the elements of a sexual harassment claim. Because I believe the trial court correctly stated the elements of a sexual harassment claim, I would hold that the jury instruction—consistent with the "totality of the circumstances" analysis—was a proper statement of the law. Accordingly, I respectfully dissent.

### I.

The majority proposes, in my view, an additional separate element to a hostile environment sexual harassment (HESH) claim by requiring a plaintiff to show that the alleged sexual conduct *either* (a) unreason-

ably interfered with work performance *or* (b) created an intimidating, hostile, or offensive work environment. Majority at 390, 38 P.3d at 109. In doing so, it rejects—as do I—the requirement that a plaintiff prove *both* (a) *and* (b). But the majority overlooks another, more reasonable alternative: courts should examine the *totality of the circumstances*, using (a) and (b) as *factors*, to determine whether the conduct is sufficiently "severe or pervasive" to qualify as a HESH claim. In other words, (a) or (b) are not additional separate alternative elements of a HESH claim. In my view, (a) and (b) are merely two of the many circumstances within "the totality of the circumstances" that may be considered in evaluating the "severe or pervasive" element of a HESH claim. Accordingly, I respectfully dissent from the majority's "separate element/ alternative means" approach in favor of the "totality of the circumstances" approach.

## II.

The "totality of the circumstances" analysis follows the administrative rules and both Hawai'i and federal case law. First, the Hawai'i Civil Rights Commission (HCRC), after outlining the required showing for sexual harassment, which admittedly appears to support the "alternative means" analysis ("[t]hat conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment"), immediately clarifies in the following subsection that the conduct must be examined in the context of the "record as a whole" and the "totality of the circumstances":

> In determining whether alleged conduct constitutes sexual harassment, the commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.

Hawai'i Administrative Rules (HAR) § 12-46–109(b). Such language is identical to its federal regulatory counterpart, as promulgated by the Equal Employment Opportunity Commission (EEOC). *See* 29 C.F.R. § 1604.11(b). To comply with our well-established rule of statutory construction—that where an administrative agency is charged with overseeing and implementing a particular statutory scheme, courts generally accord persuasive weight to such administrative construction, *see Sam Teague, Ltd. v. Hawai'i Civil Rights Comm'n*, 89 Hawai'i 269, 276 n. 2, 971 P.2d 1104, 1111 n. 2 (1999) (citation omitted)—this court must read the HCRC's rules as a whole, not selectively. Thus, the appropriate framework for establishing a HESH claim is determined by examining all relevant subsections of the statute, not merely one subsection. Indeed, the HCRC, in a case quoted by the majority, confirms the use of the "totality of the circumstances," rather than the "separate element/alternative means," approach: "The conduct was sufficiently severe or pervasive to alter the conditions of employment, *such as* having the purpose or effect of unreasonably interfering with an individual's work performance or by creating an intimidating, hostile or offensive working environment." Majority at 388, 38 P.3d at 107 (quoting *Santos v. Niimi*, No. 91–001–E–SH at 2 (HCRC Final Decision Jan. 25, 1993) (citations omitted)) (emphasis added). In this way, the HCRC noted that many factors should be considered—not merely (a) or (b) in isolation—to determine whether the conduct element was sufficiently severe or pervasive.

Second, in *Steinberg v. Hoshijo*, 88 Hawai'i 10, 18, 960 P.2d 1218, 1226 (1998), this court detailed the elements required in establishing a HESH claim by citing to HAR § 12-46–109. In doing so, this court properly parsed all relevant subsections of the statute and expressly pointed out that "[i]n determining whether alleged conduct constitutes sexual harassment, HAR § 12–46–109(b) instructs the HCRC to 'look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.' " *Steinberg*, 88 Hawai'i at 18, 960 P.2d at 1226.

Moreover, *Steinberg* relies on federal case law, specifically *Ellison v. Brady*, 924 F.2d 872 (9th Cir.1991), which, as described *infra*,

also supports the "totality of the circumstances" approach with respect to the severe or pervasive conduct element.

The majority here found this additional and separate element to a HESH claim in *Steinberg*:

> 3. that the conduct had the purpose or effect of either:
>
> a. *unreasonably interfering with an individual's work performance or*
>
> b. *creating an intimidating, hostile, or offensive work environment.*

Majority at 387, 38 P.3d at 106 (quoting *Steinberg*, 88 Hawai'i at 18, 960 P.2d at 1226 (citing *Ellison*, 924 F.2d at 879)) (emphases added). But *Steinberg* misconstrues *Ellison*. In truth, *Ellison* actually states quite differently:

> [W]e hold that a female plaintiff states a prima facie case of hostile environment sexual harassment when she alleges conduct which a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment *and* create an abusive working environment.

*Ellison*, 924 F.2d at 879 (emphasis added). In other words, *Steinberg* adopted the "separate element/alternative means" method based exclusively on a misapprehended case. As a result, this court should rectify such error or, at least, fully explain its divergence from federal case law. To neglect such a glaring error would be to compound mistakes and muddle the jurisprudence in this complex area of law.

Indeed, it appears odd that this court would diverge from federal case law without explanation, especially given that we have long declared that federal case law is highly instructive in the area of employment discrimination. Only recently, this court noted that "Hawai'i employment discrimination law was enacted to provide victims of employment discrimination the same remedies, under state law, as those provided by Title VII of the Federal Civil Rights Act of 1964." *Sam Teague, Ltd.*, 89 Hawai'i at 281, 971 P.2d at 1116 (citing Hse Stand. Comm. Rep. No. 549, in 1981 House Journal, at 1166; Sen. Stand. Comm. Rep. No. 1109, in 1981 Senate Journal, at 1363). Thus, "the federal courts' interpretation of Title VII is useful in construing Hawai'i's employment discrimination law." *Id.* (citing *Furukawa v. Honolulu Zoological Soc'y*, 85 Hawai'i 7, 13, 936 P.2d 643, 649 (1997)); *see also Shoppe v. Gucci America, Inc.*, 94 Hawai'i 368, 377, 14 P.3d 1049, 1058 (2000). Especially where the state and federal statutory provisions are similar, this court explained, "The federal courts have considerable experience in analyzing these cases, and we look to their decisions for guidance." *Shoppe*, 94 Hawai'i at 377, 14 P.3d at 1058 (quoting *Furukawa*, 85 Hawai'i at 13, 936 P.2d at 649). In fact, as far as I can tell, this court has followed federal case law in the employment discrimination area—particularly where Hawai'i and federal statutory provisions are similar—in almost all cases. *See, e.g., Shoppe*, 94 Hawai'i at 368, 14 P.3d at 1049 (prima facie claim and burden-shifting in age discrimination context); *Sam Teague, Ltd.*, 89 Hawai'i at 269, 971 P.2d at 1104 (unemployment benefits as collateral source payments); *Furukawa*, 85 Hawai'i at 7, 936 P.2d at 643 (similarly situated employees); *Puchert v. Agsalud*, 67 Haw. 25, 677 P.2d 449 (1984) (unlawful retaliatory discharge). In this case, not only are the relevant federal and state statutory provisions similar, *compare* 42 U.S.C. § 2000e–2(a)(1); *with* HRS § 378–2(1)(a) (1993), but the applicable EEOC guideline and the HCRC's rule are identical, *compare* 29 C.F.R. § 1604.11(a)(3); *with* HAR § 12–46–109. Yet the majority insists that this court diverged from federal case law in *Steinberg* without explanation.

Relatedly, given our traditional consideration of federal case law, it seems unusual to trailblaze a new path—especially one contrary to federal law—with no more than one mis-cited citation to a federal case. To worsen matters, the majority discounts the vast body of established federal case law as "confusing." Majority at 391, 38 P.3d at 110. But these cases are confusing and inconsistent only when applying the "separate element/ alternative means" analysis.

Third, federal case law not only rejects the "separate element/alternative means" approach, but also supports the "totality of the circumstances" approach. In *Ellison*, which

this court relied heavily on in *Steinberg*, the Ninth Circuit directly addressed the variation between the United States Supreme Court's language in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (conduct must "alter the conditions of [the victim's] employment and create an abusive working environment"), and the EEOC guideline language (conduct "creates an intimidating, hostile, or offensive environment or where it unreasonably interferes with work performance"). The *Ellison* court reconciled the supposed difference by pointing out that the EEOC guideline language is actually "encompassed" within the *Meritor* language:

> We do not think that these standards are inconsistent. The Supreme Court used the words "abusive" and "hostile" synonymously in *Meritor*. The *Meritor* Court also approved of and paid detailed attention to the EEOC's guidelines, and it implicitly adopted the EEOC's position that sexual harassment which unreasonably interferes with work performance violates Title VII. Similarly, although we only expressly incorporated [the language from *Meritor*], that part also encompasses the EEOC's [guideline language]. *Conduct which unreasonably interferes with work performance* **can** *alter a condition of employment and create an abusive working environment.*

924 F.2d at 877 (emphases added). It is significant that the Ninth Circuit specified "can," rather than "can, by itself." In this way, rather than declaring, as does the majority, that conduct which unreasonably interferes with work performance, by itself, is sufficient to establish a prima facie case, the Ninth Circuit actually noted only the possibility that it may. Such distinction centers on whether the "totality of the circumstances" is to be considered. Thus, the *Ellison* court explained that "conduct which unreasonably interferes with work performance" is included as a factor that "alter[s]

a condition of employment and create[s] an abusive working environment." [1] Depending on the totality of the circumstances and consideration of the record as a whole, which would include "whether such conduct created an intimidating, hostile, or offensive work environment," the fact that the "conduct unreasonably interfered with work performance" *may or may not* present a prima facie case for sexual harassment.

Most recently in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the United States Supreme Court observed, "[I]n *Meritor*, we held that sexual harassment so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment violates Title VII." *Id.* at 786 (quotation and internal quotation marks omitted) (brackets in original). The Court then clarified that courts should "*determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including* the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and *whether it unreasonably interferes with an employee's work performance.'*" *Id.* at 787–88 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (emphases added).

To reiterate "what was plain from [its] previous decisions," the United States Supreme Court in its most recent decision again stated that

> [w]orkplace conduct is not measured in isolation; instead, "whether an environment is sufficiently hostile or abusive" must be judged "by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance;

---

1. In fact, an analysis of the phrase "unreasonably interferes with work performance" reveals that it is properly characterized as a factor in deciding whether conduct "alters the conditions of employment and creates an abusive working environment." To determine what is "unreasonable," the court must examine the interference in conjunction with the severity and frequency of the conduct—the same examination in deciding whether the conduct "alters the conditions of employment and creates an abusive working environment." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

and whether it unreasonably interferes with an employee's work performance.'" *Clark County School Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (quoting *Faragher*, 524 U.S. at 786–88 (citations omitted)). Therefore, the Court expressly noted that whether conduct "unreasonably interferes with an employee's work performance" is not an "alternative means" of establishing a HESH claim, but rather a factor to be considered in examining the "totality of the circumstances" regarding such claim.

Similarly, the Ninth Circuit in *Ray v. Henderson*, 217 F.3d 1234 (9th Cir.2000), examined whether the plaintiff, for purposes of summary judgment, had presented evidence sufficient to raise a genuine issue of fact as to his being subjected to a hostile work environment after he complained about the treatment of women in his workplace. The Ninth Circuit first stated that, *"[t]o determine whether an environment is sufficiently hostile, we look to the totality of the circumstances, including* the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and *whether it unreasonably interferes with an employee's work performance.'" Id.* at 1245 (quoting *Faragher*, 524 U.S. at 787 (citations omitted)) (emphases added). Then, the Ninth Circuit evaluated the totality of the circumstances in that case, including (a) whether the conduct unreasonably interfered with work performance and (b) whether the conduct created an intimidating, hostile, or offensive work environment:

> Here, after [Plaintiff] made his complaint about the treatment of women at the Willits Post Office, he was targeted for verbal abuse related to those complaints for a period lasting over one and [a] half years. His supervisors regularly yelled at him during staff meetings; they called him a "liar," a "troublemaker," and a "rabble rouser," and told him to "shut up." Additionally, [Plaintiff] was subjected to a number of pranks, and was falsely accused of misconduct.
>
> Not only did his supervisors make it harder for [Plaintiff] to complete his own

tasks, they made [Plaintiff] an object lesson about the perils of complaining about sexual harassment in the workplace. [Plaintiff's supervisors] made it clear to the other staff that disadvantageous changes in management style were due to [Plaintiff's] complaints. . . . [Plaintiff's supervisors] also fostered animus in other employees whose working conditions were affected. Other employees began to distance themselves from [Plaintiff], and some stopped talking to him. In November of 1995, the difficulties at work rose to such a level that [Plaintiff] took stress leave from his job.

> We conclude that [Plaintiff] has presented evidence that is, for purposes of summary judgment, sufficient to raise a genuine issue of facts as to whether he was subjected to a hostile work environment.

*Id.* at 1245–46. Thus, the Ninth Circuit assessed the totality of the circumstances by analyzing both factor (a) ("his supervisors ma[de] it harder for [plaintiff] to complete his own tasks") and factor (b) (verbal abuse, pranks, making plaintiff an "object lesson"). Moreover, such analysis indicates that both factors are often difficult to separate and evaluate in isolation.

Such dictates by Hawai'i and federal case law, in addition to the established practice of the HCRC, require the "totality of the circumstances" approach. Even the majority concedes as much. In conclusion, after justifying its proposed "separate element/alternative means" approach, the majority surprisingly embraces the "totality of the circumstances" approach. Majority at 390–91, 38 P.3d at 109–110 ("[W]e also emphasize that . . . courts must 'look at the record as a whole and at the totality of the circumstances. . . .'").

## III.

Indeed, the overly mechanistic and formulaic approach adopted by the majority would exclude potentially meritorious plaintiffs. First, suppose a plaintiff fell just short of establishing (a) (alleged conduct "unreasonably interfered with work performance"). In addition, this same plaintiff fell just short of establishing (b) (alleged conduct "created an

intimidating, hostile, or offensive work environment"). The application of the rigid "separate element/alternative means" method would absolutely bar this plaintiff from her day in court. On the other hand, under the flexible "totality of the circumstances" analysis, which examines the record as a whole, including both (a) and (b) as factors, this plaintiff would likely have demonstrated conduct that is sufficiently "severe or pervasive" to qualify as a HESH claim.

Second, as the majority explains, the conduct must be evaluated both from the subjective standpoint of the claimant and from an objective standpoint of a reasonable person of the claimant's gender in the claimant's position. Majority at 390, 38 P.3d at 109 (holding that the claimant must show, *inter alia,* "(5) the claimant actually perceived the conduct as having such purpose or effect; and (6) the claimant's perception was objectively reasonable to a person of the claimant's gender in the same position as the claimant."). Assume, for example, that a trial court found that the alleged conduct did not unreasonably interfere with the plaintiff's work performance (subjective aspect of (a)), although a reasonable woman would have found that such conduct unreasonably interfered with her work performance (objective aspect of (a)). On the other hand, the trial court also found that the plaintiff believed the conduct created an offensive work environment (subjective aspect of (b)), but that a reasonable woman would not have found such conduct created an offensive work environment (objective aspect of (b)). In other words:

| | Subjective Standpoint ("plaintiff") | Objective Standpoint ("reasonable woman") |
|---|---|---|
| (a) Conduct "unreasonably interfering with an individual's work performance" | No | Yes |
| (b) Conduct "creating an intimidating, hostile, or offensive work environment" | Yes | No |

Under the "separate element/alternative means" approach, such plaintiff would fail to establish a prima facie case and would be categorically barred from bringing suit against her employer. In contrast, the "totality of the circumstances" approach would likely allow such plaintiff to have her day in court. The majority argues that "the claimant's perception [must be] objectively reasonable." Majority at 390, 38 P.3d at 109. And I agree. But that in no way contradicts examining (a) and (b) from both a subjective and objective standpoint. Indeed, it appears necessary. For example, to determine whether claimant's subjective viewpoint that conduct unreasonably interfered with her work performance is objectively reasonable, one would engage in a two-step analysis. First, one would examine whether claimant actually considered the conduct to unreasonably interfere with her work performance. Second, one would determine whether a reasonable woman would have considered the conduct to unreasonably interfere with her work performance.

A critical examination of my hypothetical only confirms my point that under the majority's separate element/alternative means method, such a claimant would fail and abandoned by the discrimination statute that is supposed to be "remedial and humanitarian" and "generously construed . . . to afford claimant hearings on the merits and to prevent the loss of valuable rights." *Puchert v. Agsalud,* 67 Haw. at 36–37, 677 P.2d at 458 (citations omitted).

In sum, the majority's "separate element/alternative means" approach directly contradicts the "remedial and humanitarian nature" of the employment discrimination statutes, which should be "generously construed . . . to afford claimants hearings on the merits and to prevent the loss of valuable rights." *Id.*

Additionally, the "totality of the circumstances" approach is more flexible and better captures the actual analysis undertaken by courts. Not every observation and evaluation by the court can always be classified simply as either (a) or (b), as required by the "separate element/alternative means" method. The "totality of the circumstances" approach, in contrast, acknowledges the reality of the often complex balancing and weighing

of multiple factors in examining the totality of the circumstances. Indeed, the factors to be considered, such as (a) and (b), may be interrelated and difficult to evaluate in isolation.[2] In an attempt to address the reality that conduct made illegal by sexual harassment law frequently defies easy categorization and classification such as (a) and (b), the majority argues that "[its] approach is consistent with the 'totality of the circumstances' approach." Majority at 391 n. 13, 38 P.3d 110 n. 13. But such application of the "totality of the circumstances" language from statute and case law defeats the language's very purpose. The majority's requirement is premised on the court's ability to separate (a) and (b), and reify each from the "totality of the circumstances" in a highly hypothetical vacuum.

was conduct "sufficiently severe or pervasive that it had the purpose or effect of altering the conditions of Plaintiff's employment and creating an intimidating, hostile, abusive, or offensive working environment." Moreover, it correctly added that, "in determining whether an environment is hostile or abusive, you must consider *all of the circumstances* [, including] whether [the conduct] unreasonably interferes with Plaintiff's work performance." (Emphasis added.) Accordingly, I would hold that such instruction—consistent with the "totality of the circumstances" analysis—was a proper statement of the law.

## IV.

In this case, the trial court's jury instruction properly stated that sexual harassment

2. Of course, one factor may be so well-established that it would demonstrate, in examining the totality of the circumstances, that the conduct was sufficiently "severe or pervasive" to qualify as a HESH claim.