121 P.3d 406

**Serena KRAMER, Plaintiff–Appellant,**

v.

**Libby ELLETT, Esq., Special Administrator of the Estate of Belinda Anne Pippo, Deceased; State of Hawai'i, Department of Transportation; County of Hawai'i, Department of Public Works; Doe Entities 1–10, Defendants–Appellees.**

No. 24890.

Supreme Court of Hawai'i.

Oct. 19, 2005.

Richard Turbin, Rai Saint Chu, and C. Bryan Fitzgerald, of the Law Offices of Richard Turbin, On the briefs, Honolulu, for the plaintiff-appellant Serena Kramer.

Earl I. Anzai, Attorney General, and Caron M. Inagaki and Cindy S. Inouye, Deputy Attorneys General, On the briefs, for the defendant-appellee County of Hawai'i, Department of Public Works.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by NAKAYAMA, J.

Plaintiff-appellant Serena Kramer (hereinafter "Kramer") appeals from the January 28, 2002 Amended Judgment of the circuit court of the third circuit, the Honorable Riki May Amano presiding, ruling that the applicable tort threshold established by Hawai'i Revised Statutes (hereinafter "HRS") Chapter 431:10C and Hawai'i Administrative Rules (hereinafter "HAR") § 16–23–10 was clearly and unambiguously $13,900 on November 3, 1995, and that the amount of medical-rehabilitative expenses proved by Kramer was $11,954.21, which fell short of the aforementioned threshold.

On appeal, Kramer argues that: (1) the trial court erred by failing to include evidence of $2,530.21 in medically necessary expenses which, when added to the $12,154.21 in expenses stipulated to as a result of an automobile accident, would have been adequate to meet the medical-rehabilitative limit threshold; (2) the trial court erred by failing to include the $15,000 jury verdict for future medical expenses in its calculation of the medical-rehabilitative limit threshold; and (3) the trial court erred in applying a retroactive medical-rehabilitative limit threshold requirement as a basis for granting the defendant-appellee County of Hawai'i, Department of Public Works', (hereinafter "County") Motion for Judgment as a Matter of Law.

Kramer's final point of error has merit because the insurance commissioner may not,

absent express statutory authority, amend the current threshold requirement and give it retroactive effect so as to exclude Kramer's tort claim. Because the trial court's grant of the County's Motion for Judgment as a Matter of Law must be vacated based on Kramer's final point of error, it is unnecessary to address Kramer's first two points of error.

Accordingly, the circuit court's January 28, 2002 Amended Judgment, and the September 13, 2001 Order Granting Defendant County of Hawai'i, Department of Public Works' Motion for Judgment as a Matter of Law are vacated, and the case remanded to the circuit court with instructions to enter judgment in favor of Kramer based upon the jury verdict.

## I. BACKGROUND

### A. Statement of Facts

This case arises out of a motor vehicle accident that occurred on November 23, 1995, in the County of Hawai'i. At approximately 4:30 p.m., Kramer was driving south on Route 11 during heavy rush hour traffic. She subsequently came to a complete stop in the left turn lane of the intersection of Route 11 and Route 130. Because of the heavy traffic, there were two cars in the turn lane in front of Kramer's car, as well as two cars behind. Both Kramer and Alvin Orita (hereinafter "Orita"), an eyewitness driving two or three cars behind, testified that Kramer had the green left-turn arrow when she entered the intersection. Although Kramer admitted to seeing an oncoming car approaching in one of the north-bound lanes of Route 11, she testified that she expected the car to stop because she had the green left-turn arrow. However, as Kramer entered the intersection, her car was hit by the oncoming car, which was driven by Belinda Anne Pippo (hereinafter "Pippo").

Despite the fact that Kramer and Orita testified that Kramer had the green left-turn arrow, Donnell Akana (hereinafter "Akana"), an eyewitness driving approximately two to three car lengths behind Pippo, testified that Pippo also had a green light. Dr. Robert Shanteau, an expert witness, testified that the statements of the foregoing witnesses, in addition to his personal review of the traffic signal and its components, suggested that the traffic signal at the intersection of Route 11 and Route 130 malfunctioned, creating a dangerous situation called "conflicting greens."

As a result of the accident, in her Third Amended Complaint, Kramer claimed that she suffered serious injuries, including but not limited to the following:

> blunt chest trauma with chest wall pain and difficulty breathing; chest/rib contusion; aternal fracture; costochondral fracture ribs 2 through 4; rotator cuff impingement syndrome, right shoulder; SLAP lesion or superior labral tear which will require future arthroscopic surgery; neck and back sprain/strain; bilateral carpal tunnel and paresthesia in right upper extremity; post traumatic stress disorder necessitating professional medical treatment. Plaintiff KRAMER further incurred pain, suffering, serious emotional distress and a loss of enjoyment of life.

Following the accident, Kramer engaged in various rehabilitative fitness regimes to facilitate her recovery. However, although her doctor recommended arthroscopic surgery to repair her damaged shoulder, Kramer refused the surgery and engaged in alternative forms of rehabilitation. Although Kramer has recovered somewhat from the accident, she can no longer engage in many of her previous recreational activities, including, but not limited to, running, swimming, biking, and competing in triathlons.

### B. Procedural History

#### 1. *The parties.*

On May 22, 1997, Kramer filed her complaint against Pippo and Doe Entities 1–10, alleging negligence on the part of Pippo. Kramer was subsequently informed that Pippo died on November 2, 1996. Libby Ellett was appointed as the special administrator of the estate of Pippo on February 9, 1998. Accordingly, on March 5, 1998, Kramer filed a Second Amended Complaint against Libby Ellett, (hereinafter "Ellett") as special administrator of the estate of Pippo, and Doe Entities 1–10.

On September 23, 1998, Kramer filed a Motion for Certification of Doe Entity Number 1 and to Amend Complaint. Having learned that Pippo also claimed to have a green light, and that Pippo also had credible eyewitnesses to support her claim, Kramer became aware of the possibility of a traffic signal malfunction. Thus, Kramer moved to identify the State of Hawaiʻi, Department of Transportation (hereinafter "State"), as Doe Entity Number 1 because the State owned the intersection at which the accident occurred.

On October 30, 1998, Kramer filed a Motion for Certification of Doe Entity Number 2 and to Amend Complaint. Having spoken with the State of Hawaiʻi Attorney General's office, Kramer became aware of a contract between the County and the State, under which the County is primarily responsible for the maintenance of the traffic signal in question. Accordingly, Kramer moved to identify the County as Doe Entity Number 2.

Kramer subsequently combined her two certification motions into one Motion for Certification of Doe Entities 1 and 2 and to Amend Complaint. Kramer then withdrew her September 23, 1998 Motion for Certification of Doe Entity Number 1 and to Amend Complaint and her October 30, 1998 Motion for Certification of Doe Entity Number 2 and to Amend Complaint. Accordingly, Kramer's Third Amended Complaint, filed on December 9, 1998, alleged negligence on the part of Pippo, the State, and the County.

## 2. Jury trial.

A jury trial commenced on October 23, 2000. At trial, the parties stipulated to $11,529.16 in past medical-rehabilitative expenses. Kramer also introduced some evidence as to additional past medical-rehabilitative expenses. Specifically, Kramer testified that she made payments totaling $741.96 to a fitness club called "The Gym." Furthermore, Kramer also testified that she hired a housekeeper from approximately the beginning of September 1997 through mid-June 1998. Kramer testified that she paid the housekeeper "approximately 50 to $55 every two weeks and then more during the holidays and

more when [she] moved." Kramer then testified that when she moved "George [came] in twice a week for about two weeks so that would be 100 to 110 for the last two weeks, and then during Passover it was also more." When asked how much her housekeeping expenses were during Passover, Kramer responded "Um, I don't recall exactly. I would say maybe $100, $110." Finally, Kramer also claims to have offered evidence of charges in the amount of $284.25 from Long's Pharmacy and $84.00 from Walgreen's Pharmacy. However, there is no testimony in the record as to any specific amount, and although Kramer offered exhibits specifying the foregoing amounts, the trial court excluded such evidence based on a lack of foundation.

At the close of Kramer's case, Ellett orally moved for judgment as a matter of law on the grounds that Kramer did not satisfy the jurisdictional tort threshold of $13,900 in medical-rehabilitative expenses incurred, and the State and the County both joined in the motion. The circuit court took the motions under advisement, and the case was allowed to go before the jury. On November 8, 2000, the jury returned a verdict awarding Kramer $11,529.16 in past medical-rehabilitative expenses, $15,000 in future medical-rehabilitative expenses, $6,765 in lost wages, $1,992 in special damages, and $50,000 in general damages. The jury also found that Kramer, Pippo, and the State were not negligent, and that the County was one-hundred percent negligent.

On November 14, 2000, the County filed a written Motion for Judgment as a Matter of Law, alleging that Kramer failed to satisfy the jurisdictional threshold and thus could not prevent the statutory abolition of tort liability resulting from motor vehicle accidents. On September 13, 2001, the circuit court filed an Order granting the County's November 14, 2000 Motion for Judgment as a Matter of Law. The circuit court ruled that the applicable tort threshold, established by HRS Chapter 431:10C and HAR § 16–23–10 was clearly $13,900 and that Kramer proved medical-rehabilitative expenses in the amount of $11,954.21, which fell short of the

applicable threshold. The circuit court ruled that Kramer proved an extra $425.05 over and above the jury verdict because, after the verdict, the County stipulated to accumulated charges in the amount of $425.05 for Kramer's membership at 24–Hour Fitness. The County also stipulated to $200 of miscellaneous over-the-counter medical products, and therefore the total stipulation before this court is $12,154.21.

On January 28, 2002, an Amended Judgment was filed in favor of Ellett, the State, and the County from and against any and all claims brought by Kramer. On February 5, 2002, Kramer filed a timely Notice of Appeal. Although Kramer appeals from the Amended Judgment filed on January 28, 2002, Kramer only appeals from that portion of the Amended Judgment pertaining to the Order Granting Defendant County of Hawai'i, Department of Public Works' Motion for Judgment as a Matter of Law filed November 14, 2000. Consequently, the only active defendant-appellee is the County.

## II. STANDARDS OF REVIEW

### A. Motion for Judgment as a Matter of Law.

■ In *Nelson v. University of Hawai'i*, 97 Hawai'i 376, 392 n. 14, 38 P.3d 95, 112 n. 14 (2001), this court stated that:

> HRCP Rule 50 was recently amended and no longer refers to motions for directed verdict or for JNOV. HRCP Rule 50 (2000). The new rule, consistent with the Federal Rules of Civil Procedure (FRCP) Rule 50 (as amended in 1991), refers to motions for "judgment as a matter of law," and motions made after trial are referred to as "renewed motions for judgment as a matter of law." ... [T]he change in terminology in the 1993 amendment to HRCP Rule 50 was not intended to result in a substantive change of existing Hawai'i law.

This court further stated that "[i]t is well settled that a trial court's rulings on [motions for judgment as a matter of law] are reviewed *de novo.*" *Nelson*, 97 Hawai'i at 393, 38 P.3d at 112 (citing *In re Estate of Herbert*, 90 Hawai'i 443, 454, 979 P.2d 39, 50 (1999)). When reviewing a motion for judgment as a

matter of law, "the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and [the] motion may be granted only where there can be but one reasonable conclusion as to the proper judgment." *Id.* (citing *Carr v. Strode*, 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995)).

### B. Statutory Interpretation.

■ In *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (citations omitted), this court stated that "the interpretation of a statute ... is a question of law reviewable de novo."

## III. DISCUSSION

■ Kramer essentially assigns three points of error. Arguing in the alternative, Kramer's first two points of error assert that if the applicable tort threshold is $13,900, she has satisfied it because (1) she offered evidence of additional medical expenses sufficient to satisfy the threshold, and (2) the trial court should also have included the jury's award of $15,000 for future medical expenses because under the plain language of HRS § 431:10C–306(b)(2) (1993) such expense had "accrued." In the alternative, Kramer's third point of error states that even if the trial court did not err by refusing to include the foregoing expenses, the applicable tort threshold at the time of the November 3, 1995, accident was $11,000. As previously mentioned, it is unnecessary to address Kramer's first two points of error because the present case may be resolved solely upon an analysis of Kramer's third point of error.

### A. At the Time of the Accident, the Insurance Commissioner Failed to Set a Medical–Rehabilitative Limit for the New Period.

1. *Each medical-rehabilitative period commences on September 1 and terminates on August 31.*

Generally, HRS § 431:10C–306 (1993) abolished tort liability in motor vehicle acci-

dents.[1] There are, however, several specific exceptions. HRS § 431:10C–306(b)(1)–(3). The exception applicable in the present case states that tort liability is not abolished where

> "[i]njury occurs to such person in a motor vehicle accident in which the amount paid or accrued exceeds the medical-rehabilitative limit established in section 431:10C–308 for expenses provided in section 431:10C–103(10)(A) and (B); provided that the expenses paid shall be presumed to be reasonable and necessary in establishing the medical-rehabilitative limit. . . ."

HRS § 431:10C–306(b)(2). HRS § 431:10C–308 (1993) established the medical-rehabilitative limit and stated in relevant part:

> (a) The commissioner shall annually revise the medical-rehabilitative limit by accumulating experience data on a yearly basis for all motor vehicle accidents in the State resulting in accidental harm. . . .
>
> (b) For the purposes of this section, the no-fault policy term year shall commence annually on September 1 and terminate the following August 31. For each term year, the commissioner shall make the tabulation of data necessary for the computation of the medical-rehabilitative limit during the period January 1 to December 31 preceding the September 1 start of the no-fault policy term year.
>
> (c) The medical-rehabilitative limit for the one-year period commencing September 1, 1992, shall be $10,000, provided that if the commissioner is unable to revise the medical-rehabilitative limit within the one-year period, the medical-rehabilitative limit shall continue at $10,000 for the next no-fault policy term year commencing September 1, 1993.

HRS § 431:10C–308(a) clearly made the insurance commissioner[2] responsible for setting the new medical-rehabilitative limit for each no-fault policy term year. Furthermore, HRS § 431:10C–308(b) specified that each no-fault policy term year commenced on September 1 and terminated on August 31. Therefore, the logical conclusion is that each medical-rehabilitative limit set by the insurance commissioner was required to commence on September 1 and terminate on August 31 as mandated by HRS § 431:10C–308(b). To that effect, HRS § 431:10C–308(c) provided a specific threshold, stating that the one-year medical-rehabilitative limit was $10,000, effective September 1, 1992.[3]

Consequently, it is clear that the insurance commissioner determined the new medical-rehabilitative limit and that the no-fault policy term during which the medical-rehabilitative limit was effective commenced on September 1 and terminated on August 31 of the following year.

> 2. *The no-fault policy term commencing on September 1, 1994, terminated on August 31, 1995, and the insurance commissioner did not set a new medical-rehabilitative limit until August 12, 1996.*

The schedule of medical-rehabilitative limits is set forth in HAR § 16–23–10(c) (1993). The County contends that HAR § 16–23–10(c) expressly states that the medical-rehabilitative limit is "$13,900 for accidents between September 1, 1995—August 31, 1996," that Kramer's accident occurred on November 3, 1995, and therefore that the applicable medical-rehabilitative limit is $13,900. Kramer, however, points out that the insurance commissioner did not implement the

---

1. Although HRS § 431:10C–306 was amended several times, *see* HRS § 431:10C–306 (Supp. 2004), and HRS § 431:10C–308 was eventually repealed, *see* 1997 Haw. Sess. L. Act 251, § 58 at 551, the version of the statute at the time of the accident is the version that governs the present case. Thus, because the accident occurred on November 3, 1995, the version of the statute in effect at that time is controlling.

2. HRS § 431:2–102(b) (1993) clarifies that the term "commissioner" in HRS § 431:10C–308 refers to the insurance commissioner.

3. HRS § 431:10C–308(c) specifically designated $10,000 as the medical-rehabilitative limit for the no-fault policy term commencing September 1, 1992, because there was a change in the formula used to calculate the medical-rehabilitative limit. *See* Conf. Comm. Rep. No. 150 on House B. No. 3974, House Journal, Reg. Sess., 16th Leg. 878 (1992).1992 was the intervening year in which the formula could not be implemented, and thus the legislature declared the medical-rehabilitative limit to be $10,000. *Id.*

new medical-rehabilitative limit until August 12, 1996.

For support, Kramer refers to an amendment to HAR § 16–23–10, filed with the lieutenant governor on August 2, 1996. The amendment states that "[p]ursuant to section 431:10C–308(a), HRS, the medical-rehabilitative limit during September 1, 1995 through August 31, 1996, shall be $13,900." Dep't of Commerce and Consumer Affairs, *Amendments to the Motor Vehicle Insurance Law* § 16–23–10(c) (1996). However, the amendment was filed on August 2, 1996 and was scheduled to take effect on August 12, 1996. *Id.* Thus it appears that the insurance commissioner failed to timely implement a new medical-rehabilitative limit for the no-fault policy term commencing on September 1, 1995. Accordingly, there was no stated medical-rehabilitative limit from September 1, 1995 through and including August 11, 1996. The insurance commissioner later filed the new medical-rehabilitative limit and tried to apply it to the entire period commencing from September 1, 1995 through August 31, 1996. Thus, inasmuch as the amendment purported to apply to the approximately nine-month period prior to its effective date, it purported to have a retroactive effect.

## B. HRS § 431:10C–308 Does Not Authorize the Retroactive Application of the Medical–Rehabilitative Limit.

Kramer persuasively contends that the new medical-rehabilitative limit cannot retroactively apply so as to preclude her prior claim. Kramer first argues that HRS § 91–4 (1993) states that "[e]ach rule hereafter adopted, amended, or repealed shall become effective ten days after filing with the lieutenant governor. . . ." Furthermore, the amendment itself provides that "[this] amendment[ ] shall take effect ten days after filing with the Office of the Lieutenant Governor." Dep't of Commerce and Consumer Affairs, *Amendments to the Motor Vehicle Insurance Law* § 16–23–10 (1996). Kramer also contends that inasmuch as the amendment purported to retroactively apply the new medical-rehabilitative limit, it contradicted the plain language of HRS ch. 431:10C. Kramer thus concludes that the new medical-

rehabilitative limit, $13,900, took effect on August 12, 1996 and lasted for nineteen days before terminating on August 31, 1996.

▇ Generally, the law disfavors the retroactive application of statutes and rules. The United States Supreme Court, in *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468 (1988), stated the following:

> Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. . . . By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.

*See also Landgraf v. USI Film Products,* 511 U.S. 244, 272, 114 S.Ct. 1483 (1994) (reaffirming the generally accepted principle that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result"); *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 851, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (reaffirming the presumption against retroactivity set forth in *Bowen* ). Furthermore, this court, in *Gap v. Puna Geothermal Venture,* 106 Hawai'i 325, 333, 104 P.3d 912, 920 (2004), stated that "Hawai'i statutory and case law discourage retroactive application of laws and rules in the absence of language showing that such operation was intended." Accordingly, in the present case, the insurance commissioner could not retroactively apply a medical-rehabilitative limit unless "such operation was intended." The relevant question, then, is whether an intent to permit the retroactive application of the medical-rehabilitative limit is ascertainable from the language of the enabling statute, HRS § 431:10C–308.

A review of the language of HRS § 431:10C–308 does not support the retroactive application of the medical-rehabilitative limit. First, HRS § 431:10C–308(b) states that the insurance commissioner "*shall* make the tabulation of data necessary for the computation of the medical-rehabilitative limit

during the period January 1 to December 31 preceding the September 1 start of the no-fault policy term year." *Id.* (emphasis added). The statute's use of the word "shall" negates any doubt as to the flexibility of the timetable. The statute clearly mandates that the completion of the tabulation of data for the new medical-rehabilitative limit will be completed eight months before the new limit is implemented. If the data must be tabulated eight months before the new medical-rehabilitative limit is to be implemented, it seems inconsistent that the statute would not also contemplate the timely implementation of the new medical-rehabilitative limit.

Second, and even more conclusive, is the fact that HRS § 431:10C–308(c) stated that "[t]he medical-rehabilitative limit for the one-year period commencing September 1, 1992, shall be $10,000, provided that if the commissioner is unable to revise the medical-rehabilitative limit within the one-year period, the medical-rehabilitative limit shall continue at $10,000 for the next no-fault policy term year commencing September 1, 1993." As previously mentioned, the formula for calculating the medical-rehabilitative limit was revised, and the legislature set the medical-rehabilitative limit at $10,000 during the intervening year in which the new formula could not be implemented. *See supra* note 3. Of particular relevance is the fact that the legislature expressly envisioned the situation in which the insurance commissioner would be unable to timely implement a new medical-rehabilitative limit. The legislature expected the insurance commissioner to revise the medical-rehabilitative limit during the preceding one-year no-fault policy term, and stated that "if the commissioner is unable to revise the medical-rehabilitative limit within the one-year period, the medical-rehabilitative limit shall continue at $10,000 for the next no-fault policy term year...." HRS § 431:10C–308(c). The legislature did not give the insurance commissioner the power in this situation to retroactively apply the medical-rehabilitative limit; rather the legislature expressly provided that the preceding year's medical-rehabilitative limit would carry over. Thus the logical conclusion is that the legislature did not intend the retroactive application of the medical-rehabilitative limit.

Furthermore, assuming that the language of HRS § 431:10C–308 is ambiguous as to whether it authorized the retroactive application of the medical-rehabilitative limit, we may look to other statutes within the HRS for clarification. HRS § 1–16 (1993) states that "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another." In the present case, HRS § 431:10C–308 is arguably ambiguous as to whether it authorizes retroactivity. However, the medical-rehabilitative limit is revised by administrative rule, and the legislature has generally prohibited retroactivity in administrative rules. HRS § 91–4(b) clearly states that "[e]ach rule hereafter adopted, amended, or repealed shall become effective ten days after filing with the lieutenant governor...." Furthermore, HRS § 91–3 (1993) requires notice and a public hearing prior to the adoption, amendment, or repeal of any administrative rule. Consequently, while not expressly prohibiting retroactivity, the legislature has clearly emphasized prospectivity in the administrative rulemaking process.

The County attempts to escape the inevitable by asserting that the result of the foregoing conclusion is that the new medical-rehabilitative limit would be in effect for only nineteen days, from August 12, 1996, through August 31, 1996. The County thus contends that HAR § 16–23–10 and HRS Chapter 431:10C cannot be interpreted in this way because it would lead to an absurd result. Apparently, the County's argument is that because any statutory interpretation against retroactivity would result in a strange nineteen-day effective period, the legislature must be deemed to have intended to authorize such retroactive application of the medical-rehabilitative limit. However, the fact that the medical-rehabilitative limit was effective for only nineteen days in the present case does not warrant the conclusion that the legislature must have intended to authorize such retroactivity. The legislature clearly intended that there be a medical-rehabilitative limit, and it therefore does not logically follow that a subsequent attempt to imple-

ment a prospectively revised medical-rehabilitative limit for the remainder of the term is absurd.

## C. The Applicable Medical–Rehabilitative Limit is $11,000.

Having thus established that the $13,900 medical-rehabilitative limit was effective from August 12, 1996 through August 31, 1996, the final question is what medical-rehabilitative limit applied to the period from September 1, 1995, through August 12, 1996. Kramer argues that the applicable medical-rehabilitative limit was $11,000 because the medical-rehabilitative limit from the preceding no-fault policy term continued to remain in full force and effect. Although Kramer does not provide any support for this conclusion, we believe that it has merit for the following reasons.

First, pursuant to the plain language of HAR § 16–23–10(d) (1993), in effect at the time of Kramer's accident, the medical-rehabilitative limit for the period commencing on September 1, 1994 and terminating on August 31, 1995 was $11,000. It is therefore clear that the $11,000 medical-rehabilitative limit terminated on August 31, 1995 and did not continue in full force and effect. Accordingly, there was a period of time during which the insurance commissioner had not implemented an effective medical-rehabilitative limit.

HRS § 431:10C–308 does not dictate specific remedial measures in the event that there is no effective medical-rehabilitative limit, and therefore the statute is ambiguous as to how to deal with the present situation. However, HRS § 1–15(2) (1993) states that "[w]here words of a law are ambiguous ... [t]he reason and spirit of the law, and the cause which induced the legislature to enact it, may be considered to discover its true meaning." According to HRS § 431:10C–102(a)(3) (1993), one of the primary purposes of the chapter is to limit tort liability for motor vehicle accidents. Consistent with that purpose, HRS § 431:10C–306 abolished tort liability for motor vehicle accidents except in certain limited situations. HRS § 431:10C–306(a)–(b). The specific exception applicable in the present case allowed a tort

claim to proceed if the injured person's paid or accrued expenses exceeded the medical-rehabilitative limit. HRS § 431:10C–306(b)(2). In light of the foregoing abolition of tort liability, it is clear that to permit a period of time with no medical-rehabilitative limit would be inconsistent with the "reason and spirit of the law." HRS § 1–15(2). Furthermore, as previously mentioned, there is evidence in the plain language of HRS § 431:10C–308(c) that the legislature contemplated the situation where "the commissioner [was] unable to revise the medical-rehabilitative limit within the one-year period." Rather than authorizing the commissioner to retroactively apply the medical-rehabilitative limit, HRS § 431:10C–308(c) provided that "the medical-rehabilitative limit shall continue ... for the next no-fault policy term year...." While the legislature was not speaking in general terms, but was only referring to the specific no-fault policy term year commencing on September 1, 1992 and terminating on August 31, 1993, it nonetheless provided some evidence of its intention in the event that no medical-rehabilitative limit was established for a given period of time. *See supra* note 3. Consequently, considering the "reason and spirit of the law," we conclude that there is sufficient evidence in HRS § 431:10C–308(c) to suggest that the legislature would intend the medical-rehabilitative limit from the preceding no-fault policy term to carry over if, as here, the commissioner was unable to revise the medical-rehabilitative limit during the one-year period.

## IV. CONCLUSION

In the present case, the parties initially stipulated to $11,529.16 in medical-rehabilitative expenses, and the jury returned a verdict also finding that Kramer's medical-rehabilitative expenses, paid or accrued, were $11,529.16. The County also stipulated to an additional $425.05, which represents charges from 24–Hour Fitness, and $200, which represents charges for miscellaneous over-the-counter medical products. Thus, the parties stipulated to a total of $12,154.21. This stipulated sum is greater than the medical-rehabilitative limit/tort threshold in effect at the

time of Kramer's accident, on November 3, 1995.

Therefore, the circuit court's January 28, 2002 Amended Judgment, and the September 13, 2001 Order Granting Defendant County of Hawai'i, Department of Public Works' Motion for Judgment as a Matter of Law are vacated, and the case is remanded to the circuit court with instructions to enter judgment in favor of Kramer based upon the jury verdict.